IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WENDI HATFIELD,<br><br>        Plaintiff,<br><br>v.<br><br>THE COTTAGES ON 78TH COMMUNITY ASSOCIATION, DREW KEDDINGTON, DAVE RUPRECHT, MATTHEW MEDFORD, MILLER HARRISON LLC, DOUGLAS SHUMWAY, MICHELLE POHLMAN, and PMI OF UTAH,<br><br>        Defendants.<br>_____<br>THE COTTAGES ON 78TH COMMUNITY ASSOCIATION, DREW KEDDINGTON, MATTHEW MEDFORD, MICHELLE POHLMAN, and PMI OF UTAH,<br><br>        Counterclaimants,<br><br>v.<br><br>WENDI HATFIELD,<br><br>        Counter-Defendant. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br><br>Case No. 2:19-CV-964 TS<br><br>District Judge Ted Stewart |

Plaintiff Wendi Hatfield sues her homeowner's association and others for retaliation under the Fair Housing Act ("FHA"), invasion of privacy, defamation, tortious interference with economic relations, and civil conspiracy. The defendants move for judgment on the pleadings on all of Hatfield's claims. For the reasons below, the motions will be granted.

## I.  BACKGROUND

Hatfield is a homeowner in a planned unit development in Midvale, Utah (the "Community").[1] Defendant The Cottages on 78th Community Association (the "Association") is a Utah nonprofit corporation governing the Community and comprised of the homeowners.[2] The Association acts through a five-member Management Committee (the "Board").[3] Defendants Drew Keddington and Dave Ruprecht were Board members during the relevant time.[4] Defendant PMI of Utah ("PMI") was the Association's property manager,[5] and Defendant Michelle Pohlman (a/k/a Michelle Ainge) was a PMI employee who managed the Association.[6] (Collectively, the "HOA Defendants.")  Defendants Douglas C. Shumway and the law firm of Miller Harrison, LLC (collectively, the "Attorney Defendants") provided legal counsel and representation to the HOA Defendants.[7] Defendant Matthew Medford was a homeowner and member of the Association.[8]

In a December 2018 email chain, the Board and Pohlman discussed potential responses to what they perceived as problems with Hatfield's behavior in the Community, including allegedly sending excessive emails to the property manager, making unsubstantiated complaints against

---

[1] Compl., Docket No. 2 at 2 ¶ 2.

[2] *Id.* ¶¶ 3–4, 6.

[3] *Id.* ¶ 5.

[4] *Id.* at 2–3 ¶¶ 7 and 9. The single claim against Ruprecht was dismissed by the court's order of April 23, 2020. Docket No. 67.

[5] Compl. at 3 ¶ 10.

[6] *Id.* ¶ 11.

[7] *Id.* ¶ 13. The court dismissed two of Hatfield's claims against the Attorney Defendants (civil conspiracy and tortious interference with economic relations) in its order of April 23, 2020. Docket No. 67.

[8] Compl. at 3 ¶ 8.

neighbors, and acting aggressively toward neighbors and the Board.[9] The discussion continued in March and April 2019, after Pohlman reported to the Board that she had received a homeowner complaint about Hatfield driving dangerously in the neighborhood.[10] With Shumway's assistance, the Board drafted and sent a warning letter to Hatfield in April.[11] Hatfield, through counsel, responded to the warning letter and also made an extensive request for Association records.[12] On August 8, 2019, the Board notified Hatfield that it had determined that she had failed to cease the offending activities and would be subject to a fine and individual assessment.[13]

On August 13, 2019, Hatfield filed a complaint with the Utah Labor Commission alleging religious discrimination[14] and two days later filed a small-claims complaint alleging that the Board had launched an improper enforcement action against her.[15] Hatfield, who is an insurance professional with Cincinnati Financial, then used her work email and insurance credentials to tender claims for the two actions to the Association's insurance agent later in August.[16]

*September 6, 2019 Letter*[17]

On September 6, 2019, Shumway emailed a Cincinnati Financial employee in Ohio purportedly for clarification about Cincinnati's involvement in the two actions against the

---

[9] Compl. Ex. 4, Docket No. 2-2 at 29–34.

[10] Compl. Ex. 5, Docket No. 2-2 at 35–44.

[11] Compl. Ex. 1, Docket No. 2-2 at 15–17.

[12] Compl. at 5 ¶ 23; Association's Mot. for J. on the Pleadings Ex. 1, Docket No. 100-1.

[13] Compl. Ex. 1 at 18–19.

[14] *Id.* at 8–11.

[15] *Id.* at 13–14.

[16] *Id.* at 20–24.

[17] *Id.* at 2–3.

Association. Shumway explained that Hatfield had been involved in a dispute with the Association regarding her behavior and, after filing both actions, had used her work email to contact the Association's insurance agent demanding that her complaints be tendered to the Association's insurance carriers. Shumway stated that the insurance agent told him he was confused about whether Cincinnati itself was making the claims and believed the demand for tender was legitimate because it appeared to be coming from one insurance professional to another. Shumway stated that the Association had not yet decided whether to seek insurance coverage and hoped that the tendering would not impact the Association's premiums. Shumway attached Hatfield's discrimination complaint as "Exhibit A."[18] "Exhibit B" was Hatfield's small-claims complaint along with the warning letter and notice of fines/individual assessment.[19] "Exhibit C" was Hatfield's two emails to the Association's insurance agency.[20]

*September 10, 2019 Letter and Notice of Assessment*[21]

In September 2019, homeowners in the Community received notice of a special assessment for "unbudgeted Attorney's fees and services provided by management company outside the scope of the agreement; Billed to the Association regarding recent legal disputes from a homeowner with the Cottages HOA." In a letter to homeowners dated September 10, the Board explained that it felt it important to "impress upon each owner a clear understanding of this assessment." The letter explained that the Association had incurred and would continue to incur legal expenses due to Hatfield's records requests and actions against the Association. It notified homeowners that the

---

[18] *Id.* at 5–11.

[19] *Id.* at 13–14.

[20] *Id.* at 21.

[21] Compl. Exs. 2 and 3, Docket No. 2-2 at 26 and 28.

Association might face increased insurance premiums, which could result in additional fees and assessments. The Board indicated that it did not wish to incur these expenses, but that "[c]losure to this conflict rests solely with Ms. Hatfield since she has been the party to instigate the records request, the Labor Board investigation, and now this new claim against her community."

*October 9, 2019 Annual Meeting*[22]

The Association's Annual Meeting that autumn included a discussion of the special assessment. Association representatives indicated that the Association had tendered claims for both complaints to its insurer and did not anticipate future legal expenses for those matters to be borne by the Association. Shumway clarified that the prior special assessment still had to be paid. He stated that the Association was placing the funds into a separate account, and the Board was considering returning the money to homeowners if the Association and Hatfield came to a settlement agreement. Pohlman stated that the budget for that year had not included a legal budget, nor did they budget for legal expenses in the upcoming year. Additionally, Pohlman indicated that the Association was financially healthy and even had excess funds they could use for a community event.

Hatfield alleges that various homeowners made disparaging comments about her and her complaints at the Annual Meeting, including complaining that the members unfairly had to pay legal expenses because of one person's actions and asking what rights they had to stop it. Owners indicated that they were angry, afraid to go outside, and no longer wanted to live in the Community. Shumway responded that "the best way to mitigate that and quash the negativity is to band together, get out together, get to know each other, and band together against whatever you believe

---

[22] Compl. at 8–11 ¶¶ 43–57.

is bringing your community down." Pohlman stated that if anyone felt unsafe they had the right to call the police and file a report, and she also encouraged members to come to Board meetings to express frustrations or concerns. Hatfield alleges that Shumway's comments encouraged neighbors to "band together" against her and that Pohlman intended her comments to cause other homeowners to fear Hatfield, generate complaints to the Board and police about Hatfield, and ostracize Hatfield.

Hatfield asserts that the defendants have propagated the general belief that she is unwelcome, dangerous, and problematic and states that she feels unwelcome, ostracized, unsafe, and uncomfortable leaving her home.[23] She claims to have suffered severe emotional distress and to have been treated for anxiety and insomnia because of the defendants' actions.[24]

*Procedural History*

Hatfield filed her Complaint in this court on December 5, 2019. On April 23, 2020, the court granted in part a motion to strike portions of the email chains attached to the Complaint on the basis of privilege; dismissed the civil conspiracy claim against the Attorney Defendants and Ruprecht; and dismissed the claim for tortious interference with economic relations.[25] The HOA Defendants and Medford filed two state-law counterclaims on May 28, 2020.[26] In an order of August 18, 2020, the court dismissed one of the counterclaims.[27]

---

[23] *Id.* at 12 ¶¶ 63–64.

[24] *Id.* ¶¶ 66–67.

[25] Docket No. 67.

[26] Docket No. 73.

[27] Docket No. 98.

The motions currently before the court are motions for judgment on the pleadings by the Association,[28] Medford,[29] PMI and Pohlman,[30] the Attorney Defendants,[31] and Keddington[32]; and Hatfield's Motion to Establish Waiver of Privileges.[33]

## II. DISCUSSION

### A.  Motions for Judgment on the Pleadings

The defendants seek judgment on the pleadings on all of Hatfield's claims under Rule 12(c). Courts apply the same standards in evaluating motions under Rule 12(b)(6) and Rule 12(c).[34] All well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the non-moving party.[35] The plaintiff must provide "enough facts to state a claim to relief that is plausible on its face,"[36] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[37] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[38]

---

[28] Docket No. 100.

[29] Docket No. 101.

[30] Docket No. 102.

[31] Docket No. 103.

[32] Docket No. 104.

[33] Docket No. 72.

[34] *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).

[35] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[36] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[37] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[38] *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[39] As the Court in *Iqbal* stated,

> only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.[40]

In considering a motion to dismiss, a district court considers the complaint, any attached exhibits,[41] the "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[42] The court may also consider other documents "referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[43]

1. Fair Housing Act, 42 U.S.C. § 3617
   (HOA Defendants, Attorney Defendants)

Hatfield asserts that the defendants violated the FHA by retaliating against her with the September 6th letter, the September 10th letter and Notice of Assessment, and statements at the Annual Meeting.[44] None of these actions plausibly supports a claim for retaliation under the FHA.

---

[39] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[40] 556 U.S. at 679 (internal citations and quotation marks omitted).

[41] *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011).

[42] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[43] *Jacobsen*, 287 F.3d at 941.

[44] Compl. at 13–15 ¶¶ 68–84.

The FHA, 42 U.S.C. §§ 3601 *et seq.*, prohibits discriminatory practices that deny housing to persons because of race, religion, sex, national origin, familial status, or disability. Section 3617 prohibits retaliation for exercising rights under the FHA, as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

To show retaliation under the FHA, a plaintiff must demonstrate that "(1) she engaged in a protected activity; (2) she suffered an adverse action in the form of coercion, intimidation, threats, or interference; and (3) a causal link connects the two."[45]

Hatfield's filing of an administrative complaint alleging religious discrimination under § 3604 of the FHA was a "protected activity."[46] However, the allegedly retaliatory acts did not constitute "adverse actions" under FHA and were not caused by Hatfield's discrimination complaint.

### a.   Adverse Action

Neither the FHA nor the regulations defines "coercion," "threats," "intimidation," or "interference," but the Supreme Court has suggested the FHA should be interpreted broadly.[47] Generally, courts make a fact-sensitive, common-sense determination whether the alleged acts are severe enough to be material—*i.e.*, of a type likely dissuade a person of normal fortitude from

---

[45] *Haws v. Norman*, No. 2:15-CV-00422-EJF, 2017 WL 4221064, at *8 (D. Utah Sept. 20, 2017) (unpublished).

[46] 24 C.F.R. § 100.400(c)(5) (explaining that § 3617 protects those who have "made a complaint, testified, assisted, or participated in any manner in a proceeding under the [FHA]").

[47] *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972).

exercising her rights.[48] Courts have held that § 3617 encompasses not only actions that involve physical force or overt threats but also actions that are less severe or obvious.[49] On the other hand, courts recognize that these terms are not endlessly broad: "Congress when enacting the FHA did not intend to 'convert every quarrel among neighbors . . . into a federal case.'"[50] Neither does § 3617 impose a "code of civility" on neighbors.[51] Isolated derogatory and/or false statements, trivial acts, or animus from neighbors are not sufficiently serious to constitute adverse actions.[52]

---

[48] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–70 (explaining materiality requirement and objective standard for retaliation claims under Title VII); *Geraci v. Union Square Condo. Assoc.*, 891 F.3d 274, 276–77 (7th Cir. 2018); *cf. Interference*, Black's Law Dictionary (11th ed. 2019) (explaining that "interference" is not defined by the nature of the act but by the fact that it changes an outcome).

[49] *See, e.g.*, *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 328, 330–31 (7th Cir. 2004) (holding that allegations that HOA president wrote a religious slur on the wall of a Jewish resident's property and vandalized the property stated a § 3617 claim); *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) (explaining that § 3617 encompasses a wide range of acts from racially motivated firebombings and threatening notes to exclusionary zoning, deflating appraisals, and insurance redlining) (collecting cases); *Trostenetsky v. Keys Condo. Owners Ass'n*, No. 17-cv-04167-RS, 2018 WL 2234599, at *3 (N.D. Cal. May 16, 2018) (unpublished) (holding that spreading misinformation about plaintiff's lawsuit and threatening to isolate her from community could be retaliatory); *Haws*, 2017 WL 4221064, at *11 (holding that plaintiff had made a prima facie showing that threat of fees, assessment of fees, and filing of a small claims action to collect the fees constituted adverse actions).

[50] *Reule v. Sherwood Valley I Council of Co-Owners, Inc.*, No. CIV.A. H-05-3197, 2005 WL 2669480, at *4 (S.D. Tex. Oct. 19, 2005) (unpublished) (quoting *Halprin*, 388 F.3d at 330); *see also Sporn v. Ocean Colony Condo. Ass'n*, 173 F. Supp. 2d 244, 251 (D.N.J. 2001) (explaining that incivility from community members was not sufficiently adverse to qualify as "interference" under § 3617).

[51] *Reule*, 2005 WL 2669480, at *4 ("'To hold otherwise would be to extend § 3617 to conduct it was never intended to address and would have the effect of demeaning the aims of the [FHA] and the legitimate claims of plaintiffs who have been subjected to invidious and hurtful discrimination and retaliation in the housing market.'") (alteration in original) (quoting *Sporn*, 173 F. Supp. 2d at 251–52).

[52] *See, e.g.*, *Sheikh v. Rabin*, 565 F. App'x 512, 517–19 (7th Cir. 2014) (explaining that allegations that individual neighbors at various times had made "shameful statements" about plaintiff, opposed his zoning requests, and even made a threat about burning plaintiff's house did not amount to allegation of "interference" under § 3617) (citing *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009); *Halprin*, 388 F.3d at 330); *Kromenhoek v. Cowpet Bay W. Condo. Ass'n*, 77 F. Supp. 3d 454, 459–61 (D.V.I. 2014) (finding that plaintiff could not show retaliation by community member's "cruel and insensitive" comments suggesting that the community ostracize the plaintiff, that plaintiff and/or those like her were dishonest, that disability laws are abused, that the establishments of dog owners should not be patronized, and that plaintiff should not be elected to the Board because she had a dog); *Reule*, 2005

Here, the alleged conduct was not severe enough to constitute an adverse action under § 3617. Hatfield herself does not allege that she was dissuaded by any of the four allegedly retaliatory acts, and indeed, no person of ordinary fortitude would have been. None of the allegedly retaliatory statements was made to Hatfield, and Hatfield's assertions that they were inflammatory and made with intent to persuade her to abandon her discrimination complaint are unsupported and implausible.

Regarding the September 6th letter, Hatfield has not alleged that she even knows the individual in Ohio to whom it was sent or that the individual had any involvement in or control over Hatfield's employment. Indeed, the most reasonable inference is that the individual was corporate counsel and would have had no interaction whatsoever with Hatfield. Furthermore, Hatfield does not claim that the letter pressured her to withdraw her discrimination complaint. No person of ordinary fortitude would hesitate to exercise her fair housing rights because of such a benign letter.

The September 10th letter and the Notice of Assessment conveyed the incontrovertible facts that Hatfield made a records request to the Association, Hatfield brought actions against the Association, and the Association had to incur legal fees. Members of the Association had a legitimate interest in this information, and there is nothing in the wording of the letter that was derogatory about Hatfield or would purposefully inflame members against her.[53] Hatfield insists

---

WL 2669480, at *4 (finding that treating other residents more favorably than plaintiff and blaming her for increased insurance premiums was "significantly less egregious than conduct which states a claim under § 3617").

[53] *See Geraci*, 891 F.3d at 277 ("No federal law prevents co-owners of a condominium association from knowing why their association is bearing legal costs.").

that the letter falsely states that the special assessment was due to Hatfield's conduct,[54] but the falsity of that statement is not well pleaded—surely it was substantially true that Hatfield's actions drove up legal costs for the Association and were within her control. Hatfield suggests that the Association's announcement that insurance would cover further litigation costs meant that the assessment was unnecessary.[55] But Hatfield has not alleged that insurance would cover the prior legal expenses or that the Association knew insurance would cover anything at all at the time it issued the assessment. Hatfield also points out that Pohlman later stated that the Association was financially healthy,[56] but this vague statement hardly shows that the assessment was unnecessary. Most importantly, although Hatfield vaguely asserts that the letter prompted negativity and anger from her neighbors,[57] Hatfield does not allege that the September 10th letter and the Notice of Assessment dissuaded her from pursuing her discrimination complaint.

As for the Annual Meeting, none of the statements allegedly made by Pohlman or Shumway could plausibly constitute adverse actions within the meaning of § 3617. Many of these were statements of fact about the Association's finances that members had a right to know. Some were general statements of opinion, such as Pohlman's statement that the Association was financially healthy. And others—such as suggestions that safety issues in the community should be reported to management or to the police and that members of the community should "quash the negativity" in the community and "band together against whatever you believe is bringing your community down"—cannot plausibly be construed as calls to rally against Hatfield. Hatfield's

---

[54] Compl. at 11 ¶ 58.

[55] *Id.* at 8 ¶ 44.

[56] *Id.* ¶ 45.

[57] *Id.* ¶¶ 40–42.

subjective belief that Pohlman and Shumway were inciting neighbors against her is not a basis for an FHA retaliation claim.[58]

A recent Seventh Circuit case is on point. In *Geraci*, the plaintiff filed a discrimination complaint against her condominium association and asserted that it retaliated against her by sending litigation updates to and holding an open forum with co-owners to discuss the matter. She argued that this was emotionally distressing and embarrassing. The Seventh Circuit explained:

> This is a far cry from the retaliatory conduct anti-retaliation statutes intend to prevent. . . . [N]o information revealed at the open forum or in either litigation update veered beyond factual representation of the public record. No federal law prevents co-owners of a condominium association from knowing why their association is bearing legal costs. Additionally, it should be expected that Union Square's co-owners would want to know the details of the lawsuit . . . . Sending litigation updates and holding an open forum are reasonable measures to take in order to inform co-owners of such information.
> Geraci fails to point to any conduct that a person of normal fortitude would view as coercive, intimidating, threatening, or interfering with the exercise of her protected right under the FHA.[59]

Other courts have broadly held that actions that are normal and justifiable in the course of litigation are not materially adverse under the FHA's retaliation provision.[60] All the statements Hatfield complains of, however embarrassing to Hatfield, fall into this category.

---

[58] *Cf. Elliott v. QF Circa 37, LLC*, No. 16-cv-0288-BAS-AGS, 2018 WL 2933467, at *20–21 (S.D. Cal. June 12, 2018) (unpublished) (holding that plaintiff's subjective belief that defendants intended to evict him after issuing him a non-threatening notice of lease violation was not sufficient to withstand summary judgment on a § 3617 claim); *Sporn*, 173 F. Supp. 2d at 251–52 (holding that plaintiff's subjective experience of being "shunned" by community was not an adverse action under § 3617).

[59] *Geraci*, 891 F.3d at 276–77 (citing *Burlington*, 548 U.S. 53); *see also Clark v. 100 Harborview Drive Council of Unit Owners*, No. JFM-14-3122, 2016 WL 1159198, at *10–12 (D. Md. Mar. 23, 2016) (unpublished) (explaining that factual, non-threatening communications and discussion of litigation at meetings with co-owners was not an adverse action under § 3617).

[60] *See, e.g., Dudley v. Fenton*, No. 15 C 11555, 2016 WL 4158932, at *3 (N.D. Ill. Aug. 5, 2016) (unpublished) (dismissing complaint where complained-of actions were "normal actions taken in lawsuits"); *Weatherford v. Nev. Rural Hous. Auth.*, 946 F. Supp. 2d 1101, 1114 (D. Nev. 2013), *aff'd*, 588 F. App'x 709 (9th Cir. 2014) (holding that defendants' presentation of settlement terms that included an

Because the actions Hatfield complains of do not constitute adverse actions that would interfere with exercise of a protected right under the FHA, the defendants are entitled to judgment on the pleadings on the retaliation claim.

### b.  Causal Connection

To show causation, a plaintiff must show that the defendants would have acted meaningfully differently had the individual not engaged in protected activity.[61] Here, Hatfield has not plausibly alleged that any allegedly adverse action was caused by her filing of a discrimination complaint.

Hatfield's claim that the September 6th letter was on account of her discrimination complaint is conclusory and implausible. Shumway sent the letter nearly a month after Hatfield filed the discrimination complaint and only after Hatfield herself had used her work account and work credentials to email the Association's insurance agent. Shumway's email to Hatfield's employer was clearly caused by Hatfield's emails and not by Hatfield's discrimination complaint. Hatfield protests that Shumway divulged more to her employer than was appropriate and failed to include the letter from her attorney rebutting some of the allegations in the attachments; that the reason Shumway gave for the letter was pretextual; that Shumway could have confronted Hatfield directly about this rather than contact her employer; and that Shumway used disparaging language.[62] But even if all this were true, it would not follow that Shumway did any of this because

---

agreement not to bring another appeal within the year was not an adverse action where there was no evidence Defendants attempted to coerce, intimidate, or threaten plaintiff into signing).

[61] *See Morgan v. Carrington Mortg. Servs.*, 719 F. App'x 735, 743–44 (10th Cir. 2017) (rejecting retaliation claim where allegations suggested defendants "'would have behaved the same regardless of the disability'") (quoting *Wilson v. Warren Cty.*, 830 F.3d 464, 468 (7th Cir. 2016)).

[62] Resp. to Att'y Defs.' Mot., Docket No. 116 at 10–12.

of Hatfield's discrimination complaint. On the contrary, the two documents Shumway included that contained the allegedly harmful statements were attached to and relevant to the small-claims complaint, not the discrimination complaint, so Shumway likely would have sent the same allegedly damaging documents even if Hatfield had not filed a discrimination claim. The court rejects Hatfield's speculative and implausible allegation that the discrimination complaint caused the September 6th letter.

Hatfield's allegation of a causal connection between her discrimination complaint and the September 10th letter and Notice of Assessment is also unsupported and implausible. The Board had been discussing and planning such a letter and such an assessment for at least eight months prior to Hatfield's discrimination complaint. The December 2018 emails among the Board and management discussed ongoing conflict with Hatfield. In those emails, Keddington proposed preparing for further legal expenses that might necessitate a community assessment accompanied by a notification to inform homeowners that it was necessary due to legal action with a resident. As the parties continued to spar in the months before and after Hatfield filed her discrimination complaint, including over other legally costly issues such as Hatfield's records request and small-claims complaint, the only reasonable inference is that the Board would have taken similar steps at some point even if Hatfield had never filed a discrimination complaint.

Hatfield objects that relying on the emails she attached to the Complaint to show that the Board's actions predated the discrimination complaint is improper because they are inadmissible hearsay under Fed. R. Evid. 801(c) and 802.[63] This is not so. The court does not need to assume the truth of any statements made in those emails—for example, that Hatfield was engaging in

---

[63] Resp. to Assoc.'s Mot., Docket No. 110 at 6–7.

problematic behavior in the community—to observe that the Board was discussing and planning the allegedly retaliatory actions months prior to the discrimination complaint.

Hatfield also argues that the parties' conflict prior to her discrimination complaint does not defeat a retaliation claim. Hatfield relies on *Lloyd v. Presby's Inspired Life*,[64] in which the court found that a retaliation claim could be based on "ongoing antagonism that begins prior to the allegedly protected activity and increases after the protected activity."[65] However, Hatfield has not plausibly alleged any escalation of antagonism after the discrimination complaint. The option of a special assessment and letter to the community had been floated months prior in anticipation of increasing legal costs, even without knowing that Hatfield would even consider filing a discrimination complaint. *Lloyd* is therefore inapposite. A more analogous case is *H.O.P.E., Inc. v. Lake Greenfield Homeowners Association*, in which the court explained that actions taken after the plaintiff engaged in protected activity were not retaliatory where they had been planned previously and were consistent with the defendants' positions before the protected conduct.[66]

Finally, Hatfield has not plausibly alleged that the defendants' comments at the Annual Meeting were caused by Hatfield's filing of a discrimination complaint. The comments were unspecific to that complaint and reflected concerns and conversations ongoing since at least the prior December. Hatfield's assertion that any of these statements was caused by or otherwise in retaliation for her filing the discrimination complaint is entirely speculative and conclusory.

---

[64] 251 F. Supp. 3d 891, 902 (E.D. Pa. 2017).

[65] *Id.* at 905.

[66] 330 F. Supp. 3d 1105, 1117–18 (N.D. Ill. 2018).

Because Hatfield fails to plausibly allege any adverse action or a causal link between the alleged actions and her protected activity, the defendants are entitled to judgment on the pleadings on the retaliation claim.

2.   State-Law Claims

The Tenth Circuit has suggested that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[67] In deciding whether to retain jurisdiction, a court should consider factors including "the values of judicial economy, convenience, fairness, and comity."[68] While acknowledging the judicial preference for declining supplemental jurisdiction when federal claims have been dismissed, the court finds the exercise of supplemental jurisdiction justified here. All Hatfield's state-law claims have been fully briefed and, as discussed below, are meritless. Neither the state courts nor the defendants should be burdened with them. Electing to exercise supplemental jurisdiction to grant the motions for judgment on the pleadings is the fairest and most economic resolution of the claims.

a.   Invasion of Privacy/Intrusion Upon Seclusion and Private Affairs
(Association, Attorney Defendants)

Intrusion upon seclusion is one of four types of common-law invasion of privacy.[69] "[I]ntrusion into seclusion involves physical intrusion into a place where a plaintiff has secluded

---

[67] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").

[68] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[69] *Cox v. Hatch*, 761 P.2d 556, 563 (Utah 1988) (describing the four torts including intrusion upon seclusion, appropriation of another's name or likeness, unreasonable publicity given to another's

herself—such as a defendant forcing his way into the plaintiff's home. However, intrusion into seclusion may also occur by the use of the physical senses to oversee or eavesdrop on the plaintiff's private affairs."[70] Importantly, the tort only consists of the unauthorized invasion into the private realm; it does not encompass use of private information. For example, while interception of private telephone conversations could constitute an intrusion on the plaintiffs' seclusion, the use of those conversations afterward could not.[71] In Utah, a cause of action for intrusion upon seclusion requires the plaintiff to demonstrate (1) an intentional substantial intrusion, physical or otherwise, upon the plaintiff's solitude (2) that would be highly offensive to the reasonable person.[72]

Hatfield makes no cognizable claim for intrusion upon seclusion and private affairs. Hatfield claims that the September 6th letter revealed embarrassing aspects of her personal life to her employer.[73] Even if a relationship with an employer could be considered a realm in which

---

private life, and publicity that unreasonably places another in a false light before the public) (citing Restatement (Second) of Torts § 652A (1977)).

[70] *Pascouau v. Martin Marietta Corp.*, 185 F.3d 874, at *14 (10th Cir. 1999) (unpublished) (citing Restatement (Second) of Torts § 652B cmt. b (1977)).

[71] *Quigley v. Rosenthal*, 327 F.3d 1044, 1073 (10th Cir. 2003) (explaining that use of conversations obtained by an intrusion did not constitute another intrusion); *see also Pascouau*, 185 F.3d 874 at *14 (holding that co-workers bothering plaintiff with inappropriate questions about her sex life did not support a claim for intrusion into seclusion because "liability attaches only to an *unconsented* invasion through physical or other means that actually gleans private information"); *Clements-Jeffrey v. City of Springfield, Ohio*, 810 F. Supp. 2d 857, 881 (S.D. Ohio 2011) (holding that use of intercepted sexually explicit communications to trace a stolen laptop did not constitute intrusion on seclusion even if it may have been "unprofessional and entirely gratuitous"); *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 379 (Utah Ct. App. 1997) (holding that showing coworkers a videotape of plaintiff's husband that had been doctored to make him appear to be discussing their intimate life was not the type of invasion the tort encompasses).

[72] *Stien*, 944 P.2d at 378 (citing Restatement (Second) of Torts § 652B (1977)).

[73] Compl. at 15–17 ¶¶ 85–99.

Hatfield had a reasonable expectation of privacy,[74] and even if Shumway's letter constituted an intrusion upon that realm, that intrusion is not the basis of Hatfield's objection. Surely Hatfield would not object if Shumway sent her employer a letter praising her. Hatfield really objects to the content of the letter, asserting that it was embarrassing. Other torts, such as defamation (discussed below) or publication of private facts, address such actions. Invasion of seclusion does not.

Sending a letter to another person's employer is also not highly offensive to a reasonable person; it is certainly not analogous to objectively offensive actions like peering through windows, intercepting private phone calls, or hacking into email. Even considering the content of the letter, Shumway's action was inoffensive. Shumway informed Hatfield's employer that Hatfield had used her work email and credentials as an insurance professional to tender claims to the HOA's insurance agent for Hatfield's own complaints. Hatfield does not deny that she did this, and an employer has a legitimate interest in knowing how an employee is using company email. Shumway's other actions—disclosing aspects of the dispute between Hatfield and the HOA, attaching Hatfield's discrimination complaint and related documents, inquiring whether the employer was involved in the dispute, and opining that Hatfield's use of her work email and credentials was "highly unprofessional"—are not offensive, let alone highly so.

In sum, Shumway's letter falls outside the scope of an invasion of seclusion claim and well below the threshold of "highly offensive." Thus, the motions for judgment on the pleadings will be granted as to this claim.

---

[74] *Cox*, 761 P.2d at 564 (explaining that to show invasion of seclusion, plaintiff must have had a reasonable expectation of privacy in that place).

b.  Defamation (HOA Defendants, Attorney Defendants)

Defamation is "harming the reputation of another by making a false statement to a third person."[75] To state a defamation claim, a plaintiff must show that the defendant "published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage."[76] Defamatory speech is a false assertion of fact (as opposed to an opinion)[77] that "'impeaches [the] individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule.'"[78] To determine if a statement is false or potentially defamatory, a court evaluates the statement in context, not in isolation.[79]

*September 6th Letter*

The September 6th letter contained nothing that was plausibly false and also impeached Hatfield's honesty, integrity, virtue, or reputation. Most of the statements are either clearly true from the face of the Complaint and/or exhibits, or statements of opinion that cannot be false. Where they could be false, they are either not about Hatfield or do not plausibly tarnish her character. The letter as a whole, in context, also does not convey any false or malignant impression. It accuses Hatfield of no more than sending two emails from her work account with her work credentials.

---

[75] *Pipkin v. Acumen*, 2020 UT App 111, ¶ 15, 472 P.3d 315, *reh'g denied* (Aug. 24, 2020) (quoting *Jensen v. Sawyers*, 2005 UT 81, ¶ 35, 130 P.3d 325); *see also West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994) ("At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation.").

[76] *West*, 872 P.2d at 1007–08 (Utah 1994) (citations omitted).

[77] *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000).

[78] *Pipkin*, 2020 UT App 111, ¶ 15 (alteration in original) (quoting *West*, 872 P.2d at 1008).

[79] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017) (citing *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1137–38 (10th Cir. 2014)); *Pipkin*, 2020 UT App 111, ¶ 16.

This is both true and unlikely to elicit any serious judgment on Hatfield's character. Any judgment Hatfield's employer might make as a result of this letter would not be based on anything Shumway said but on the facts of how Hatfield had used her email and credentials.

Hatfield also claims that the attachments to Shumway's letter—specifically the Association's April 10th Warning of Violation and the August 8th Notice of Fines and Individual Assessment—contained false statements. However, in the context of this letter and its attachments, the statements would not plausibly give any false impression. "Exhibit B" was Hatfield's small-claims affidavit claiming that the Association had "commenced and prosecuted a groundless and improper enforcement action." Shumway included the Warning of Violation and Notice of Fines as part of the same exhibit. Shumway's letter did not point to these attachments for their truth; they were clearly included as the basis of Hatfield's small-claims complaint. In context, they convey no more than the true impression that there was a dispute between Hatfield and her HOA. Furthermore, even if a reader would have believed the allegations against Hatfield in those documents, they were not capable of sustaining a defamatory impression. They accuse Hatfield of little more than being a nuisance to her neighbors, the Board, and the property manager. This is simply not the type of foul impeachment of character defamation law addresses.

*September 10th Letter*

Hatfield asserts that the September 10th letter contained false and defamatory statements, but the statements are either not false or not about Hatfield. Hatfield alleges that the letter insinuated that Hatfield posed a threat to others' physical safety, but nothing in the letter can reasonably be read to imply this. Hatfield further claims that the letter falsely asserted that the special assessment was solely for attorney fees incurred as a result of Hatfield's legal actions, but

the allegation of falsity is conclusory, and furthermore, this is not a statement about Hatfield. Viewing the entirety of the letter from the perspective of a recipient, it was neither false nor defamatory. If the letter generated any contempt on the part of the neighbors, it would be due to the indisputable fact that Hatfield's actions were costly to the Association, not to anything inflammatory about the letter.

*Privileges*

The defendants also argue that their statements are protected by one or more privileges that apply to statements made in circumstances where there are overriding interests in free speech.[80] Where a defendant shows that such a privilege exists, "the defendant is protected unless plaintiff pleads and proves facts which indicate actual malice in that the utterances were made from spite, ill will or hatred toward him"[81] or shows that the statements were excessively published.[82] "Whether a publication is conditionally privileged is a question of law to be determined by the trial court, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice."[83]

As an initial matter, Hatfield argues that privilege should not be dispositive at the pleadings stage.[84] This argument is based on misapplication of a Utah Court of Appeals case that explained that a plaintiff need not plead the inapplicability of a privilege as a prerequisite to stating a claim

---

[80] *DeBry v. Godbe*, 1999 UT 111, ¶ 10, 992 P.2d 979.

[81] *Combes v. Montgomery Ward & Co.*, 228 P.2d 272, 277 (Utah 1951); *see also Lind v. Lynch*, 665 P.2d 1276, 1278–79 (Utah 1983).

[82] *See Pratt v. Nelson*, 2007 UT 41, ¶ 33, 164 P.3d 366.

[83] *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991).

[84] Resp. to Assoc.'s Mot. at 18–19.

for defamation.[85] Instead, the court clarified, "the defendant must first raise privilege as an affirmative defense in a responsive pleading in order to shift the burden to the plaintiff to show the inapplicability of a qualified privilege."[86] Here, the defendants do not seek to dismiss the complaint for failure to state a claim; they asserted these privileges in their responsive pleadings and now seek judgment on the pleadings.[87] They have appropriately asserted the privileges and, where the privileges are sufficiently pleaded, the burden shifts to Hatfield to plead facts sufficient to overcome the privileges. As explained below, she has not done so.

The "judicial proceedings privilege" "immunizes certain statements that are made during a judicial proceeding from defamation claims."[88] The privilege "presumptively attaches to conduct and communications made by attorneys on behalf of their clients in the course of judicial proceedings."[89] Shumway's letter to Hatfield's employer falls squarely within his conduct as an advocate for his client and is therefore privileged. Hatfield argues that Shumway excessively published the allegedly defamatory statements because her employer was not involved in the matter,[90] but Hatfield had inserted her employer in the matter by using her work email and credentials to tender the Association's claims. Furthermore, even if Shumway's letter and attachments went somewhat beyond what was necessary for the letter's stated purpose, they were directly related to the claims Hatfield had tendered from her Cincinnati account and with her

---

[85] *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 2005 UT App 325, ¶¶ 5–7, 122 P.3d 891.

[86] *Id.* ¶ 6.

[87] Att'y Defs.' First Am. Answer, Docket No. 71 at 10 ¶ 3, 19 ¶ 14, 20 ¶ 19, 22 ¶ 21; Other Defs.' Am. Answer, Docket No. 74 at 16.

[88] *Pratt* , 2007 UT 41, ¶ 27.

[89] *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 36 285 P.3d 1157.

[90] Resp. to Assoc.'s Mot. at 19–22.

professional credentials and thus they did not exceed the scope of matters in which Cincinnati had a legitimate interest. Hatfield further claims that Shumway acted maliciously,[91] but at most, Hatfield has alleged that Shumway could have accomplished his stated objective in a less embarrassing way. This is far short of malice.[92] The judicial proceedings privilege applies to the September 6th letter.

Additionally, the "legitimate interest privilege" protects both the September 6th letter and the Association's September communications with members.[93] As explained above, members of an HOA have a legitimate interest in knowing why their association is being sued and why they are being asked to bear legal costs. Hatfield responds that the privilege does not apply because the statements were made without reasonable belief that they were true and were made with malice,[94] but these allegations are conclusory and unsupported. Hatfield also argues that the statements were excessively published,[95] but this is plainly not so. Hatfield herself had written a letter to the same group—homeowners in the Association—months prior, detailing her ongoing dispute with the Board and its financial implications for the Association.[96]

---

[91] Compl. at 21 ¶ 4.

[92] *Cf., e.g.*, *Moss*, 2012 UT 42, ¶¶ 38, 43 (calling the scope of the judicial proceedings privilege "extraordinary" and finding that the privilege applied to attorneys acting in their clients' interests even if their client had an improper or illegal motive) (quoting *Loigman v. Twp. Comm. of Middletown*, 889 A.2d 426, 438 (N.J. 2006)).

[93] *See Brehany*, 812 P.2d at 58 (citing *Lind*, 665 P.2d at 1278–79; Restatement (Second) of Torts §§ 594–96 (1977)).

[94] Resp. to Assoc.'s Mot. at 22–23 (citing *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 21, 221 P.3d 205). *See Brehany*, 812 P.2d at 58 (explaining that a "plaintiff can show abuse of the privilege by proving that the defendant acted with malice").

[95] Resp. to Assoc.'s Mot. at 24. *See Brehany*, 812 P.2d at 58 (explaining that publishing defamatory material beyond those with a legally justified reason for receiving it is abuse of the privilege).

[96] Assoc.'s Mot. Ex. B, Docket No. 100-2. Although materials outside the pleadings cannot be considered without converting the motion into one for summary judgment, Fed. R. Civ. P. 12(b), the court

In sum, because the challenged statements were not false, not defamatory, and/or privileged, the defendants are entitled to judgment on the pleadings on the defamation claim.

### c.  Tortious Interference with Economic Relations
### (Association, Attorney Defendants)

In the court's order of April 23, 2020, the court dismissed the claim for tortious interference with economic relations on the motion of the Attorney Defendants, reasoning that Hatfield's conclusory allegations were insufficient to state a claim.[97] The Association asks the court to clarify that the dismissal was against the Association as well.[98] Hatfield opposes applying the court's prior ruling to the claim as against the Association, asserting that she suffered emotional distress from interference with her economic relations.[99] But the court already determined that Hatfield did not adequately plead any such interference, so any harm Hatfield might have suffered could not have been caused by such interference. The defendants are entitled to judgment on the pleadings on this claim.

### d.  Civil Conspiracy (All Defendants)

The court dismissed Hatfield's civil conspiracy claim against the Attorney Defendants and Ruprecht in its order of April 23, 2020.[100] The remaining defendants now argue that Hatfield fails to plausibly state a claim of civil conspiracy against them.

---

properly considers this letter in evaluating the motions for judgment on the pleadings because is referred to in Hatfield's complaint, Compl. Ex. 2 at 26, and of undisputed authenticity. *See GFF Corp.*, 130 F.3d at 1384–85.

[97] Docket No. 67 at 11.

[98] Assoc.'s Mot. at 25.

[99] Resp. to Assoc.'s Mot. at 25.

[100] The claim was dismissed as to the Attorney Defendants and Ruprecht in the court's April 23, 2020 order. Docket No. 67 at 11–12.

"To prove a civil conspiracy, plaintiff must show the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[101] Importantly here, a civil conspiracy claim "require[s], as one of [its] essential elements, an underlying tort."[102] Where a civil conspiracy plaintiff has not sufficiently pleaded any underlying tort, the civil conspiracy claim must be dismissed.[103]

As discussed above, Hatfield has failed to adequately plead any other claim. Thus, she has failed to plead a civil conspiracy and the motions for judgment on the pleadings will be granted as to this claim.

## B. Counterclaim

The judicial preference for declining to exercise supplemental jurisdiction over state-law claims when federal claims are dismissed applies equally to counterclaims.[104] Here, the relevant factors weigh in favor of declining to exercise supplemental jurisdiction over the defendants' counterclaim. The defendants have not requested that the court retain jurisdiction, there has been

---

[101] *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).

[102] *Estrada v. Mendoza*, 2012 UT App 82, ¶ 13, 275 P.3d 1024 (alterations in original) (internal quotations and citations omitted); *cf. Beck v. Prupis*, 529 U.S. 494, 500–06 (2000) (explaining the common-law principle that a plaintiff can sue for civil conspiracy only if she has been injured by an act that is itself tortious).

[103] *Estrada*, 2012 UT App 82, ¶ 13 (quoting 16 Am. Jur. 2d *Conspiracy* § 50 (2009) ("[I]f the acts alleged to constitute the underlying wrong provide no cause of action, then neither is there a cause of action for the conspiracy itself.") (alteration in original)).

[104] *See, e.g.*, *Williams v. Four Corners Family Dental, LLC*, Civ. No. 11-00578 MV/LFG, 2012 WL 13076574, at *3 (D.N.M. Apr. 20, 2012) (unpublished) (declining to exercise supplemental jurisdiction over state-law counterclaim when plaintiff voluntarily dismissed federal claim); *Betancourt v. 1999 Union Plaza, L.P.*, No. 09-CV-0520-CVE-TLW, 2009 WL 3765173, at *3 (N.D. Okla. Nov. 10, 2009) (unpublished) (same); *Oman v. Davis Sch. Dist.*, No. 1:03CV57DAK, 2005 WL 8176568, at *6 (D. Utah May 12, 2005) (unpublished) (declining to exercise supplemental jurisdiction over state law counterclaims after disposing of federal claim on summary judgment).

no briefing on or other investment in the counterclaim, and the court already dismissed the other counterclaim without prejudice. Therefore, the court will dismiss the remaining counterclaim without prejudice.

C.  Motion to Establish Waiver of Privileges

Because the court grants the motions for judgment on the pleadings on all Hatfield's claims and declines to exercise jurisdiction over the counterclaim, effectively ending the case, this motion is moot.

## III. CONCLUSION

It is therefore

ORDERED that the defendants' motions for judgment on the pleadings (Docket Nos. 100, 101, 102, 103, and 104) are GRANTED.

IT IS FURTHER ORDERED that the defendants' First Counterclaim is dismissed without prejudice.

IT IS FURTHER ORDERED that the plaintiff's motion (Docket No. 72) is DENIED AS MOOT.

DATED this 1st day of March, 2021.

BY THE COURT:

Ted Stewart
United States District Judge

27