FILED
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

**July 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

WENDI HATFIELD, an individual,

    Plaintiff Counterclaim Defendant - Appellant/Cross-Appellee,

v.

THE COTTAGES ON 78TH COMMUNITY ASSOCIATION, a Utah nonprofit corporation; DREW KEDDINGTON, an individual; MICHELLE POHLMAN, f/k/a Michelle Ainge, an individual; PMI OF UTAH, a Utah limited liability company,

    Defendants Counterclaimants - Appellees/Cross-Appellants,

 MATTHEW MEDFORD, an individual,

    Defendant - Appellee,

MILLER HARRISON, LLC, a Utah limited liability company; DOUGLAS SHUMWAY, an individual,

    Defendants - Appellees/Cross-Appellants,

and

DAVE RUPRECHT, an individual,

    Defendant - Appellee.

_____

Nos. 21-4035; 21-4042; 21-4045
(D.C. No. 2:19-CV-00964-TS)
(D. Utah)

## ORDER AND JUDGMENT[*]

_____

Before **HOLMES**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

This case stems from a dispute between a homeowner and her homeowners'
association. The parties appeal and cross-appeal the dismissal of several claims and
one counterclaim; they also challenge an order in which the district court partially
granted motions to strike part of Appellant Wendi Hatfield's complaint as containing
privileged information. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background

Hatfield owns a townhome in The Cottages on 78th, a planned unit
development in Midvale, Utah. The development is governed by The Cottages on
78th Community Association ("HOA"), of which Matthew Medford was a member.
The HOA acts through a five-member Management Committee ("Board"), on which
Drew Keddington and Dave Ruprecht served. PMI of Utah ("PMI") was the HOA's
property manager, and Michelle Pohlman was the PMI employee who helped manage
the HOA. The HOA, Keddington, PMI, and Pohlman are collectively referred to as
the "HOA Defendants." Douglas Shumway and Miller Harrison, LLC—collectively,
the "Attorney Defendants"—served as legal counsel to the HOA Defendants.

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Beginning in August 2016, Hatfield exhibited behavior issues in The Cottages. Among other things, she allegedly surveilled homeowners, drove recklessly through The Cottages, and harassed homeowners to conform to her interpretation of the HOA's rules. So in December 2018, the Board and Pohlman discussed how to deal with Hatfield, including whether to send her a cease-and-desist letter. Those discussions continued into March 2019. And in April 2019, the Board sent Hatfield a letter that described her problematic behavior, stated that she was violating the HOA's "no-nuisance" rule, and warned her that failing to stop her behavior could lead to fines ("Cease-and-Desist Letter").

Two days later, Hatfield responded to the Cease-and-Desist Letter through her attorney. She denied the various allegations and demanded that the Board withdraw its warning. She also requested several broad categories of HOA records on the basis that she was concerned about the HOA's governance and operations.

In response, Shumway and a law clerk spent about twenty hours collecting documents responsive to Hatfield's requests. They spent three to five more hours reviewing those documents for potentially privileged material. And on May 13, 2019, Shumway provided Hatfield copies of the documents on the HOA's behalf.

On May 23, 2019, Hatfield's lawyer informed Shumway that the document production contained potentially privileged emails. Shumway and his law clerk then searched the document production but found no privileged material. On May 30, 2019, Shumway asked Hatfield's lawyer to more specifically identify the potentially privileged documents. But Hatfield's lawyer never responded.

3

By August 8, 2019, Hatfield hadn't ceased the conduct that the Board identified in the Cease-and-Desist Letter. So in a follow-up letter to Hatfield, the Board fined and assessed her $2,231.25 for continued violations of the HOA's rules and the legal costs that were incurred to bring her behavior into compliance.

On August 13, 2019, Hatfield filed a complaint with the Utah Antidiscrimination and Labor Division ("UALD"). She alleged that the HOA, Keddington, and PMI violated the Utah Fair Housing Act by engaging in religious discrimination and retaliation. Among other allegations, Hatfield claimed that Keddington, whom she described as a Mormon, treated other Mormons more favorably than her, a non-Mormon.[1] She alleged that the fines levied against her were retaliation for a letter that she sent the Board in June 2019. In that letter, Hatfield warned the Board that her attorney had advised her that she had grounds to file a housing-discrimination claim and other claims against the HOA, PMI, and Keddington.

Two days later, Hatfield filed a small-claims complaint against the HOA. She alleged that the HOA had "commenced and prosecuted a groundless and improper enforcement action, including demanding over $2,000 for their attorney fees and causing [her] to incur attorney fees." R. Vol. 1 at 67.

---

[1] In accordance with the usage of the parties, we use the informal designation of "Mormon" for members of the Church of Jesus Christ of Latter-day Saints or the Church of Jesus Christ.

At the time, Hatfield was an insurance professional at Cincinnati Insurance Company ("Cincinnati"). Between August 27–28, 2019, she used her Cincinnati email address to tender her UALD and small-claims actions to the HOA's insurance agent. She did so without the HOA's knowledge or permission. That led the HOA's insurance broker to think that both claims were Cincinnati-related matters. So on September 6, 2019, Shumway sent a letter to a Cincinnati employee to clarify whether the company was somehow involved with Hatfield's UALD and small-claims complaints ("September 6th Letter"). Shumway stated that if Cincinnati was involved, he wanted to discuss the company's standing to bring the complaints. He also said that if Cincinnati wasn't involved, then "Ms. Hatfield's use of her work email and credentials to tender her own claims [was] entirely unprofessional." *Id.* at 57. Shumway attached Hatfield's UALD and small-claims complaints, the Cease-and-Desist Letter, the letter fining her $2,231.25, and her emails tendering her complaints to the HOA's insurer.

On September 10, 2019, the Board sent HOA members a letter about an upcoming special assessment ("September 10th Letter"). The Board explained that the assessment was for legal costs that it had incurred to respond to Hatfield's records requests. The Board also informed the members about Hatfield's UALD and small-claims complaints and warned of future assessments if it had to continue defending against either. The Board expressed its desire to end the dispute but acknowledged that "[c]losure to this conflict rests solely with Ms. Hatfield since she

has been the party to instigate the records request, the Labor Board investigation, and now this new claim against her community." *Id.* at 80.

On October 9, 2019, the HOA held its annual meeting and discussed the special assessment, among other matters. Members learned that the HOA had tendered claims for the UALD and small-claims actions to its insurer, so it didn't anticipate that the HOA or its members would incur future legal expenses. Pohlman praised the HOA's financial health and said that it hadn't budgeted any funds for legal expenses during the upcoming year.

Various HOA members also made disparaging comments about Hatfield during the meeting. In response, Shumway encouraged homeowners to "band together against whatever you believe is bringing your community down." *Id.* at 30. Pohlman encouraged homeowners to attend Board meetings to express their concerns and to file police reports. Hatfield has since felt unwelcome, ostracized, and unsafe in The Cottages.

## II.   Procedural Background

In November 2019, Hatfield voluntarily withdrew her UALD and small-claims complaints. She did so to "minimize and focus the outstanding litigation." Supp. App. Vol. 4 at 756. In December 2019, Hatfield filed her district court complaint, asserting five claims: (1) retaliation in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3617 and 24 C.F.R. § 100.400; (2) invasion of privacy and intrusion upon seclusion and private affairs; (3) defamation; (4) tortious interference with economic

relations; and (5) civil conspiracy. Her complaint does not include the religious-discrimination claim that was in her UALD complaint.

Hatfield's complaint contained attachments, including "Exhibit 4" and "Exhibit 5." Exhibit 4 is a December 2018 email chain between Board members and Pohlman about how to address their issues with Hatfield. Exhibit 5 is a March 2019 email chain between the Board, Pohlman, and Shumway about the Cease-and-Desist Letter. Both exhibits were produced to Hatfield in response to her records requests. Upon reviewing these exhibits, the HOA Defendants, Attorney Defendants, and Medford believed that they contained privileged material. So they moved to strike the exhibits and the paragraphs in Hatfield's complaint that quoted from them. The Attorney Defendants also moved for partial dismissal, seeking dismissal of the tortious-interference and civil-conspiracy claims against them. Dave Ruprecht moved to dismiss the civil-conspiracy claim, which was the only claim that Hatfield asserted against him.

The district court ruled on these motions in one order. The court granted in part and denied in part the motions to strike, finding that portions of Exhibits 4 and 5 were attorney-client privileged and that the Defendants hadn't waived privilege despite inadvertently producing the documents to Hatfield. The court granted the motions to dismiss in full.

The Defendants eventually answered Hatfield's complaint. Some also asserted counterclaims. The HOA counterclaimed for breach of its declaration (*i.e.*, its document establishing covenants and restrictions). The HOA Defendants

7

counterclaimed for wrongful use of civil proceedings and, alternatively, abuse of process. Hatfield moved to dismiss the HOA Defendants' counterclaim, which the district court granted.

The HOA Defendants, Medford, and the Attorney Defendants eventually moved for judgment on the pleadings against Hatfield's remaining claims. The district court granted those motions. And because the court dismissed all of Hatfield's claims, it denied as moot Hatfield's "Motion to Establish Waiver of Privileges," which asked the court to reconsider its ruling on the motions to strike. The court also declined to exercise supplemental jurisdiction over the HOA's breach-of-declaration counterclaim.[2]

On appeal, Hatfield challenges the district court orders that dismissed all of her claims. The HOA Defendants challenge the order that dismissed their wrongful-use/abuse-of-process counterclaim. And except for Ruprecht, every party challenges the motion-to-strike order.

## DISCUSSION

## I.    Order Partially Striking Exhibits 4 and 5

As noted above, the district court struck portions of Exhibits 4 and 5 as privileged. Hatfield argues that the district court erred in doing so because, among other reasons, the Defendants had waived privilege when they voluntarily produced the exhibits to Hatfield. She further argues that the district court erred in denying as

---

[2] The HOA doesn't appeal the dismissal of that counterclaim.

8

moot her Motion to Establish Waiver of Privileges. The HOA Defendants, Attorney

Defendants, and Medford argue that Exhibits 4 and 5 are fully privileged and that

paragraphs 27–38 in Hatfield's complaint should be stricken because they quote from

the exhibits.

We needn't decide the privilege issue, because its outcome doesn't change the

ultimate result. *See Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir. 1991) ("We will

not undertake to decide issues that do not affect the outcome of a dispute."). Whether

any of Hatfield's claims survive the pleading stage doesn't turn on what is and isn't

privileged in her complaint. Even if Exhibits 4 and 5 are non-privileged, as discussed

below, all of Hatfield's claims would still fail as a matter of law.[3]

## II.   Order Dismissing Claims Against Attorney Defendants and Ruprecht

The district court granted the motions to dismiss filed by the Attorney

Defendants and Ruprecht. Thus, it dismissed Hatfield's civil-conspiracy claims

against both, and it dismissed the tortious-interference claim against the Attorney

Defendants. "[W]e review de novo the district court's grant of a motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as

the district court." *Sunrise Valley, LLC v. Kempthorne*, 528 F.3d 1251, 1254 (10th

---

[3] Because we don't disturb the district court's privilege rulings, the HOA's
Motion to Redact and Seal is granted. Hatfield's Motion to File Outside the Deadline
is also granted. The Clerk of the Court shall seal Hatfield's Opening Brief and
"Appellant's Appendix—Volume I," and Hatfield shall re-file both with appropriate
redactions to Documents 2 and 67. The Clerk of the Court shall also seal "Appellees'
Supplemental Appendix—Volume I" and the Appellees shall re-file it with
appropriate redactions to Document 61.

Cir. 2008) (citation omitted). All well-pleaded facts are accepted as true and all

reasonable allegations are viewed in the light most favorable to the plaintiff. *Id.* We

must avoid weighing potential evidence and ask only whether the plaintiff's

complaint suffices to state a claim for relief. *Id.*[4]

## A.     Civil Conspiracy

To prove a civil-conspiracy claim under Utah law, a plaintiff must show "(1) a

combination of two or more persons, (2) an object to be accomplished, (3) a meeting

of the minds on the object or course of action, (4) one or more unlawful, overt acts,

and (5) damages as a proximate result thereof." *Israel Pagan Est. v. Cannon*, 746

P.2d 785, 790 (Utah Ct. App. 1987). Additionally, the plaintiff must sufficiently

plead an underlying tort. *Estrada v. Mendoza*, 275 P.3d 1024, 1029 (Utah Ct. App.

2012). And a plaintiff "must present clear and convincing evidence to carry his

burden of proof on a charge of civil conspiracy." *Israel Pagan*, 746 P.2d at 790.

Hatfield alleges that the Attorney Defendants "were hired and paid by the

Association to provide legal counsel and representation to the Association and the

---

[4] In the reply portion of her combined response-and-reply brief, Hatfield
argues that Utah's pleading standards, including Utah Rule of Civil Procedure 8,
apply to her state-law claims, rather than federal pleading rules. But we note that "a
valid Federal Rule of Civil Procedure governs over a state procedural rule if the two
rules answer the same question." *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d
938, 940 (10th Cir. 2020) (quotations and citation omitted). Federal Rule of Civil
Procedure 8, entitled "General Rules of Pleading," establishes the same rules as
Utah's Rule 8, which is also entitled "General Rules of Pleadings." We therefore
apply the Federal Rule 8 and the federal pleading standards to Hatfield's state-law
claims. But even if we applied Utah's Rule 8, that would not change the result of this
appeal.

other defendants including Keddington, Pohlman, and PMI." R. Vol. 1 at 23. She

alleges further that the Attorney Defendants, as well as Ruprecht, "were agents of the

Association when most of the events and actions identified in [the] complaint

occurred." *Id.* The district court dismissed Hatfield's civil-conspiracy claims,

concluding that agents of a principal can't be liable for conspiracy when they act

within the scope of their authority.

Indeed, "[a]s a general rule, 'it is not possible for a single legal entity

consisting of the corporation and its agents to conspire with itself,' because they do

not constitute two separate persons." *Tomlinson v. NCR Corp.*, 296 P.3d 760, 768

(Utah Ct. App. 2013) (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031,

1036 (11th Cir. 2000)), *rev'd on other grounds,* 345 P.3d 523 (Utah 2014). Hatfield

refers to this as the "intracorporate conspiracy doctrine." Op. Br. at 16.

Hatfield makes several arguments against applying the doctrine. First, she says

that Utah courts haven't adopted it. Though Utah courts haven't recognized the

doctrine by that name, the Utah Court of Appeals has acknowledged the principle that

an entity and its agents can't conspire with one another. *Tomlinson*, 296 P.3d at 768.

In addition, Utah federal district courts have applied the doctrine to Utah claims. *See*

*Podium Corp., Inc. v. Chekkit Geolocation Servs., Inc.*, 2021 WL 5772269, at *7-8

(D. Utah Dec. 6, 2021) (relying on the doctrine to dismiss a civil-conspiracy claim);

*see also Cox v. Cache Cnty.*, 2013 WL 4854450, at *6 (D. Utah Sept. 11, 2013)

(same), *aff'd in part*, 644 F. App'x 703 (10th Cir. 2016). We cannot find a Utah case

that rejected the doctrine, nor has Hatfield tried convincing us that a Utah court would do so.

Hatfield next argues that the doctrine doesn't apply when an alleged conspiracy is part of a broader discriminatory pattern. She notes that Matthew Medford was not an agent of the HOA, so his participation renders the doctrine inapplicable. Yet all her allegations about Medford are either conclusory or factually unsupported. For instance, she repeatedly alleges that Medford and the other Defendants "had a meeting of the minds" to harm her. R. Vol. 1 at 44–45. Those allegations merely recite one required element for civil conspiracy and lack factual support, so we don't accept them as true. *See Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("Courts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement."). Hatfield also alleges that "based on information and belief," Medford was tasked with fabricating complaints and allegations against Hatfield. R. Vol. 1 at 45. But her complaint is also void of factual support for those allegations, so we don't accept those as true either. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 551 (2007) (declining to accept a conclusory allegation "upon information and belief" that companies entered a conspiracy, absent facts to make the allegation plausible). Therefore, Hatfield hasn't plausibly alleged a broader discriminatory pattern that involved Medford.

Finally, Hatfield contends that the doctrine doesn't apply when employees are motivated by illicit purposes, when a conspiracy involves retaliation against another

member of an organization, or when an attorney engages in fraudulent or tortious
action. But her allegations don't plausibly show that any party was motivated by an
illicit purpose. And as discussed below, she has not plausibly alleged retaliation
under the FHA or any other tortious conduct. So the district court properly dismissed
her civil-conspiracy claims against the Attorney Defendants and Ruprecht.

### B.   Tortious Interference

To prove tortious interference, a plaintiff must prove that the defendant (1)
intentionally interfered with the plaintiff's existing or potential economic relations,
(2) by improper means, and (3) caused injury to the plaintiff. *Eldridge v. Johndrow*,
345 P.3d 553, 565 (Utah 2015).

Hatfield's tortious-interference claim is based on the September 6th Letter that
Shumway sent Cincinnati to determine how the company was involved with
Hatfield's UALD and small-claims actions. The district court dismissed this claim
against the Attorney Defendants because Hatfield failed to plausibly allege any
interference with existing or potential economic relations. The court found the
relevant allegations conclusory.

Hatfield argues that the September 6th Letter qualifies as an act of
interference. She also insists that Shumway's reason for contacting Cincinnati—to
determine the company's involvement—was pretextual, and that the Defendants' true
aims were to cause her emotional distress and damage her reputation. In her view, the
district court erred by accepting the Defendants' pretextual justification and
overlooking how flagrant the September 6th Letter was.

Even if we assume that the September 6th Letter qualifies as interference,
Hatfield has not plausibly alleged that it constituted an "improper means" of
interference. "The improper means element is satisfied when the means used to
interfere with a party's economic relations are contrary to law, such as violations of
statutes, regulations, or recognized common-law rules." *Mumford v. ITT Com. Fin.
Corp.*, 858 P.2d 1041, 1044 (Utah Ct. App. 1993) (quotations omitted). In her
complaint, Hatfield alleges that the letter satisfies the element because it contained
defamatory statements and violated the FHA. But as we explain below, she has not
plausibly alleged claims for defamation or retaliation under the FHA. It follows that
she cannot satisfy the "improper means" element for this claim. So the district court
correctly dismissed her tortious-interference claim against the Attorney Defendants.

## III. Order Dismissing HOA Defendants' Counterclaim

The district court granted Hatfield's motion to dismiss the HOA Defendants'
wrongful-use/abuse-of-process counterclaim. We review that dismissal de novo,
accepting all well-pleaded facts as true and construing reasonable allegations in the
HOA Defendants' favor. *Sunrise Valley*, 528 F.3d at 1254. Though the HOA
Defendants styled the counterclaim as a single claim, the district court analyzed it as
two separate claims—a claim for wrongful use of civil proceedings and a claim for
abuse of process. We do the same.

### A. Wrongful Use of Civil Proceedings

"[A] claim for wrongful use of civil proceedings consists in instituting or
maintaining civil proceedings for an improper purpose and without a justifiable

basis." *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 340 (Utah 2005) (quotations

omitted). The party asserting this claim must show that (1) the actor who initiated the

prior proceeding did so without probable cause and primarily for a purpose other than

securing proper adjudication on the claim, and (2) the prior proceedings were

terminated in favor of the party against whom they were brought. *Id.* at 340–41. A

party brings a claim with probable cause if she reasonably believes in the facts on

which her claim is based and that her claim is valid under applicable law. *Nielsen v.

Spencer*, 196 P.3d 616, 621 (Utah Ct. App. 2008).

 The HOA Defendants allege that they never discriminated against Hatfield due

to her religion and that Hatfield always intended to withdraw her UALD complaint.

The district court found the relevant allegations conclusory and lacking factual

support.

 On appeal, the HOA Defendants argue that they either believed Hatfield was

Mormon or didn't know her religion. They again insist that Hatfield never seriously

planned to pursue her UALD complaint and filed it merely to set up her FHA

retaliation claim in this lawsuit. They further note that Hatfield's federal complaint

does not contain the religious-discrimination claim that formed the basis of her

UALD complaint.

 We are unpersuaded. That the HOA Defendants thought that Hatfield was

Mormon or didn't know her religion is belied by allegations in her UALD complaint,

including that "Keddington referred to her as an 'apostate' Mormon when

introducing her to another Mormon resident." R. Vol. 1 at 64. Hatfield also cited

specific examples of Keddington, who she asserted is Mormon, showing preferential treatment toward other Mormons, including by advocating on their behalves to PMI while declining to do the same for non-Mormons. *Id.* She alleged that "the general understanding among residents in the community is that if you are an active member of the Mormon Church, Respondent Keddington will take care of you, but he will treat you differently if you are not." *Id.* Hatfield also alleged that the Board's $2,231.25 fine against her was retaliation for her June 2019 letter suggesting that she could sue the HOA Defendants for housing discrimination. Given these allegations, Hatfield could have reasonably believed in the facts underlying her UALD claim. Likewise, she could have reasonably believed in her claim's validity given the advice of her lawyer.

Moreover, the HOA Defendants haven't plausibly alleged that Hatfield's UALD action was resolved in their favor. "[U]nder Utah law, a defendant is required to have the underlying action resolved *on the merits in his or her favor* prior to initiating a claim for wrongful use of civil proceedings." *Hatch v. Davis*, 102 P.3d 774, 781 (Utah Ct. App. 2004) (emphasis added). Hatfield voluntarily dismissed her UALD claim, and the HOA Defendants haven't offered caselaw to illustrate how voluntary dismissal is a resolution on the merits.

### B.    Abuse of Process

Abuse of process occurs when a party uses legal process against another to accomplish a purpose for which it isn't designed. *Anderson*, 116 P.3d at 340. The party asserting this claim must show (1) "an ulterior purpose" and (2) "an act in the

use of the process not proper in the regular prosecution of the proceedings." *Id.* at

341 (citation omitted). If a plaintiff uses process for a proper purpose, "the mere fact

that it has some other collateral effect does not constitute an abuse of process."

*Crease v. Pleasant Grove City*, 519 P.2d 888, 890 (Utah 1974). Nor is it an abuse of

process if a plaintiff sues to intimidate or embarrass the defendant. *Puttuck v.

Gendron*, 199 P.3d 971, 977 (Utah 2008). Furthermore, "complicating the course of

litigation and increasing the costs of defense do not qualify as a collateral advantage

or ulterior purpose for the claim of abuse of process." *Id.*

The HOA Defendants argue that Hatfield filed her UALD complaint merely to

bait them into retaliating against her, in turn creating grounds for her federal

complaint. As support, they note that Hatfield filed her small-claims complaint just

two days after filing her UALD complaint. She then tendered both complaints to the

HOA's insurer. In response, Shumway sent the September 6th Letter to Cincinnati,

the HOA sent the September 10th Letter to homeowners, and during the HOA's

annual meeting, the HOA had to answer questions about its dispute with Hatfield.

Hatfield then voluntarily dismissed her UALD complaint and said that she would

pursue her claims in federal court, but her federal complaint doesn't include the

religious-discrimination claim that her UALD complaint was based on.

We agree with the district court that the HOA Defendants have not plausibly

alleged an abuse-of-process claim. Even when construing the allegations in their

favor, we note that the HOA Defendants have not alleged an ulterior purpose—it's

just as plausible that Hatfield filed her UALD complaint to genuinely pursue it. As

noted above, Hatfield's UALD complaint stated that based on her attorney's advice, she had grounds to file a housing-discrimination claim. Hatfield also set out factual allegations to support her claim, including those that we already summarized regarding Keddington. The face of her UALD complaint states her belief that she had a viable claim and filed it in good faith, rather than to bolster her federal complaint or achieve some other ulterior motive. Though her claim might have annoyed the HOA Defendants or increased their legal costs, that doesn't render her conduct actionable as an abuse of process.

## IV.    Order Dismissing Hatfield's Remaining Claims

The district court granted the Defendants' motions for judgment on the pleadings as to all of Hatfield's claims. "We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (citation omitted).

### A.    FHA Retaliation (42 U.S.C. § 3617)

Hatfield argues that the district court erred in dismissing her FHA claim under 42 U.S.C. § 3617. That section states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

*Id.*

To prove a § 3617 retaliation claim, a plaintiff must show that "(1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).[5]

But a plaintiff cannot rely on § 3617 for trivial or isolated disputes. *Id.* at 783 ("Interference is more than a quarrel among neighbors or an isolated act of discrimination[.]") (quotations and citation omitted); *see also Halperin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.) ("[W]e do not want, and we do not think Congress wanted, to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case."). Rather, there must be conduct "that a person of normal fortitude would view as coercive, intimidating, threatening, or interfering with the exercise of her protected right under the FHA." *Geraci v. Union Square Condo. Ass'n*, 891 F.3d

---

[5] The district court articulated a different standard, namely that a plaintiff must show "(1) she engaged in a protected activity; (2) she suffered an adverse action in the form of coercion, intimidation, threats, or interference; and (3) a causal link connects the two." R. Vol. 3 at 563 (citation omitted). This circuit hasn't adopted that standard, nor has it issued an opinion that delineates the required elements for a § 3617 claim. But in another case involving a § 3617 claim, we implicitly acknowledged the four-part test from *Bloch*, which the district court had relied on. *See Mayo v. Performance Prop. Mgmt., Inc.*, 780 F. App'x 653, 655 (10th Cir. 2019) ("The [district] court further discussed the required elements for claims under § 3617 of the FHA and the cited HUD regulations, which the court concluded were also not properly pleaded."). We therefore rely on that test here.

274, 277 (7th Cir. 2018); *see generally Burlington N. and Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006) (holding that retaliation claims should be judged based on an objective standard). So the question is whether the conduct that Hatfield alleges rises to that level.

Hatfield says it does so, arguing that the September 6th Letter, the September 10th Letter, the notice of assessment that was sent to homeowners, and the Defendants' statements during the annual meeting support her claim.[6] She likens the Defendants' conduct to that which was alleged in *Revock v. Cowpet Bay Western Condominium Ass'n*, 853 F.3d 96 (3d Cir. 2017).

In *Revock*, two members of a condominium association requested an exception to the association's no-pet policy for their emotional-support dogs. *Id.* at 100. While their requests were pending, the two members kept their dogs at their condos. *Id.* That drew criticism from other residents. *Id.* Over a five-month period, two defendant-condo owners published numerous disparaging blog posts about the dog owners on the Internet. *Id.* For example, one defendant called the owners "miscreants" and "totally selfish, spoiled, brats, willing to flaunt their illegality in every one[']s face." *Id.* at 114. (alteration in original) (citation omitted). The other wrote that "it is time for the association to go on the offensive and file suit in a court of law to force the issue. When these ladies have to start spending their own cash . . .

---

[6] In her briefing, Hatfield doesn't clearly indicate whether the Defendants' alleged actions constituted coercion, a threat, intimidation, or interference. But in her complaint, she alleges that their actions constitute all those terms.

the rubber will meet the road on how far everyone is willing to go on this issue." *Id.*
at 103 (citation omitted). Both defendants kept writing disparaging Internet posts
even after one dog owner expressed embarrassment about her need for an emotional-
support animal being made public. *Id.* at 115.

The district court granted the defendants' motion for summary judgment, but
the Third Circuit reversed, concluding that a reasonable jury could find that the
defendants' comments were severe or pervasive enough to constitute interference for
a § 3617 claim. *Id.*

The conduct that Hatfield relies on for her § 3617 claim is less pervasive,
harassing, and derogatory than the conduct in *Revock*. A person of normal fortitude
would not view any of the acts that Hatfield complains of as coercive, intimidating,
threatening, or interfering. In the September 6th Letter, Shumway merely asked if
Cincinnati was involved with Hatfield's UALD and small-claims actions and noted
that if it wasn't, Hatfield's conduct was "entirely unprofessional." R. Vol. 1 at 57.

The Board's September 10th Letter and its notice of assessment are similarly
harmless, as they merely aimed to notify HOA members about the special assessment
due to Hatfield's records requests. Although the September 10th Letter suggested that
Hatfield's conduct might lead to future assessments, the Board also acknowledged
that "[c]losure to this conflict rests solely with Ms. Hatfield[.]" *Id.* at 80. As for the
notice of assessment, it merely stated that the amount owed was for "unbudgeted
Attorney's fees . . . [b]illed to the Association regarding recent legal disputes from a

homeowner within the Cottages HOA." *Id.* at 82. We see no issue with the language
in either communication.

Finally, the comments made at the annual meeting do not compare to those in
*Revock*. Pohlman made only general remarks about reporting safety issues, either by
showing up to Board meetings or filing police reports. Shumway encouraged HOA
members to "band together against whatever is bringing your community down." *Id.*
at 30. Even if we assume that those comments were directed at Hatfield, they're still
a far cry from the more direct, repeated, and hostile comments in *Revock*.

Hatfield says that her case differs meaningfully from *Geraci*. We disagree. In
*Geraci*, a condominium owner requested an accommodation from her condominium
association because she allegedly suffered from post-traumatic stress disorder
("PTSD"). 891 F.3d at 276. The association denied her request, so she sued. *Id.*
While that lawsuit was pending, the association's board of directors held an open
forum to discuss the case's status with other co-owners. *Id.* The board also published
two litigation updates. *Id.* Based on those actions, the owner brought a § 3617
retaliation claim, arguing that the board had never acted that way before and that she
suffered emotional distress and embarrassment due to the board revealing her PTSD
to others. *Id.* But the Seventh Circuit concluded that the board's actions didn't
constitute coercive, intimidating, threatening, or interfering conduct. The court
stated:

> [I]t should be expected that [the association]'s co-owners would want to
> know the details of the lawsuit, if for nothing else, to consider whether
> the suit should be settled. Sending litigation updates and holding an open

forum are reasonable measures to take in order to inform co-owners of such information.

*Id.* at 277.

The same is true of Hatfield's case, as HOA members would surely want to know the status of the dispute with Hatfield and why they had to pay a special assessment. The September 10th Letter and the notice of assessment were reasonable means to communicate that information.

Because Hatfield hasn't plausibly alleged that the Defendants engaged in coercive, threatening, intimidating, or interfering conduct, the district court appropriately dismissed her § 3617 claim.

### B.    Intrusion Upon Seclusion and Private Affairs

Hatfield argues that the district court erred in dismissing her claim for intrusion upon seclusion and private affairs. Intrusion upon seclusion is a privacy tort. A plaintiff must allege "(1) that there was an intentional substantial intrusion, physically or otherwise, upon the solitude or seclusion of the complaining party, and (2) that the intrusion would be highly offensive to the reasonable person." *Stein v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 378 (Utah Ct. App. 1997) (quotations and citation omitted).

Intrusion typically takes two forms. The first is intruding upon someone's physical solitude or seclusion, such as by invading the person's home or searching his or her bag at a mall. *Id.* The second extends beyond physical intrusion and includes eavesdropping on private conversations, peering into home windows, and

persistent, unwanted phone calls. *Id.* The key is that "there must be something in the nature of prying or intrusion, and that mere noises which disturb a church congregation, or bad manners, harsh names, and insulting gestures in public, are not enough." *Id.* (citation omitted). And the intrusion must occur where the plaintiff has a reasonable expectation of privacy. *Cox v. Hatch*, 761 P.2d 556, 564 (Utah 1988).

Hatfield argues that the September 6th Letter constitutes an intrusion. But rather than cite and discuss caselaw that supports her position, Hatfield states: "There is no case suggesting that the September 6th letter could not satisfy this factual element." Op. Br. at 26. That is not a sufficient legal argument. "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (citation omitted). We decline to do Hatfield's research for her. *Id.*

Nor do we see how the September 6th Letter would qualify as either form of intrusion that is described above. The letter isn't a physical invasion of Hatfield's privacy. Nor is it like eavesdropping, peering into windows, or making incessant phone calls. On top of this deficiency, Hatfield makes no attempt to explain how her relationship with Cincinnati constitutes a matter in which she has a reasonable expectation of privacy.

Even if the September 6th Letter were an intrusion, it would not be highly offensive to a reasonable person. When evaluating offensiveness, courts consider factors like "the degree of intrusion, the context, conduct and circumstances

surrounding the intrusion as well as the intruder's motives and objectives, the setting
into which he intrudes, and the expectations of those whose privacy is invaded."
*Stein*, 944 P.2d at 379 (citation omitted). Nothing about Shumway's single letter to
Cincinnati strikes us as highly offensive, particularly because Hatfield used her
Cincinnati email address to tender her claims—without permission—to the HOA's
insurance agent. That understandably caused the HOA's insurance broker to think
that both claims were Cincinnati-related matters. And Shumway didn't use the letter
to pry into Hatfield's business at Cincinnati; he merely summarized Hatfield's
complaints, explained the grounds for confusion—prompted by Hatfield—and asked
how Cincinnati was involved with her complaints.

Therefore, the district court properly dismissed Hatfield's intrusion-upon-
seclusion claim.

### C.   Defamation

Hatfield next argues that the court erred in dismissing her defamation claim.
To allege a defamation claim, a plaintiff must show that (1) the defendants published
statements concerning her, (2) the statements were false and defamatory, (3) the
statements were not subject to any privilege, (4) the statements were published with
the requisite degree of fault, and (5) their publication resulted in damage. *West v.
Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).

Allegedly defamatory conduct is reviewed in context, not in isolation. *Id.* at
1009. "To be defamatory under Utah law, a communication must impeach an
individual's honesty, integrity, virtue, or reputation or publish his or her natural

defects or expose him or her to public hatred, contempt, or ridicule." *Cox*, 761 P.2d at

561. Statements are not defamatory just because they are "nettlesome or

embarrassing." *Id.*

Hatfield says that in dismissing her defamation claim, the district court failed

to consider the context surrounding the September 6th Letter, the September 10th

Letter, the notice of assessment, and the statements made during the HOA's annual

meeting. Yet she fails to elaborate on why the context supports her claim, which is

grounds to reject the argument. *See MacArthur v. San Juan Cnty.*, 495 F.3d 1157,

1160–61 (10th Cir. 2007) ("[M]ere conclusory allegations with no citations to the

record . . . do[es] not constitute adequate briefing.") (quotations and citation

omitted)).

But even when considering those communications in context, we agree with

the district court that they were not defamatory. Shumway sent Cincinnati the

September 6th Letter only after Hatfield used her Cincinnati email address to tender

her UALD and small-claims complaints to the HOA's insurer. In the letter, Shumway

summarized Hatfield's complaints before stating that he spoke to the HOA's

insurance agent, who "was confused about whether or not Cincinnati itself was

making the claims." R. Vol. 1 at 57. So Shumway asked Cincinnati to clarify whether

and how it was involved.

Given that context, none of Shumway's statements in the September 6th Letter

were defamatory. The district court was correct that "[a]ny judgment Hatfield's

employer might make as a result of this letter would not be based on anything

Shumway said but on the facts of how Hatfield had used her email and credentials."
R. Vol. 3 at 575. Although Shumway attached several documents, including the
Cease-and-Desist Letter, the Board's follow-up letter that fined Hatfield, and
Hatfield's UALD and small-claims complaints, Hatfield does not explain how any of
those documents contained defamatory statements. Nor do we find them defamatory
when reviewing them ourselves.

As for the September 10th Letter, Hatfield argues that it's false that her actions
were "costly" to the HOA. That argument is unpersuasive given the Board's notice of
assessment, through which HOA members were each charged $131.72 to cover
unbudgeted attorney fees that the HOA incurred. And in both communications, the
relevant statements are about legal costs, not Hatfield, so they are not actionable. *See
Thomson Newspapers*, 872 P.2d at 1007 (plaintiff "must show that defendants
published the statements *concerning him*") (emphasis added)).

Finally, Hatfield argues that the district court ignored statements made by
Shumway and Pohlman during the annual meeting. In her complaint, she alleges that
"Pohlman insinuated that the dispute with Ms. Hatfield implicated personal safety
issues and encouraged owners to . . . contact the police and file a report." R. Vol. 1 at
29 (quotations omitted). She also alleges that Shumway encouraged Community
members to "band together" against her. *Id.* at 30. Even if these comments pertained
to Hatfield, they amount to nettlesome remarks.

In sum, the district court correctly dismissed Hatfield's defamation claims.

27

### D.   Tortious Interference

The district court dismissed Hatfield's tortious-interference claim against the HOA because she failed to plead any actual interference and made only conclusory allegations. The court dismissed this claim against the Attorney Defendants for substantially the same reasons. *See supra* Section II.B.

On appeal, Hatfield raises the same arguments for the Attorney Defendants as she does the HOA. We summarized those arguments in Section II.B and found them unpersuasive as to the Attorney Defendants. They are likewise unpersuasive as to the HOA. So we agree with the district court's dismissal.

### E.   Civil Conspiracy

After first dismissing Hatfield's civil-conspiracy claims against the Attorney Defendants and Ruprecht, the district court later dismissed her civil-conspiracy claims against the remaining Defendants.

We noted in Section II.A that to allege a civil-conspiracy claim, a plaintiff must also plausibly allege an underlying tort. *Puttuck*, 199 P.3d at 978. For all the reasons above, Hatfield hasn't plausibly alleged an underlying tort. So her civil-conspiracy claims against the remaining Defendants fail, and we again agree with the district court's dismissal.

## CONCLUSION

We affirm the district court's orders.[7]

Entered for the Court


Gregory A. Phillips
Circuit Judge

---

[7] In light of our resolution of her appeal, we reject Hatfield's request for the appointment of a different district judge on remand as moot.